# EXHIBIT D

AFFIDAVIT OF BARRY SCHWAB

I, BARRY SCHWAB,

1. That I am the Defendant-Counter Plaintiff in the above captioned matter and reside at 5298 Cedarhurst Drive, West Bloomfield, Michigan 48322.

2. That I am a B.S. graduate of Massachusetts Institute of Technology having majored in Chemical Physics, and an M.S. graduate of Brown University having majored in Physics, and further completed work towards a Ph.D at the University of Illinois majoring in Physics.

3. That my various expertise in the areas of Video, Computer hardware and software, and electronics has resulted in me being named inventor on more than 25 U.S. Patents, and numerous foreign Patents.

4. That at the time of my engagement with Mr. Ronald Thomas I was a consultant and had formed a consulting company called SABRE Corporation.

5. That I already had been working on behalf of other undisclosed clients (because of confidentiality agreements) on video editing systems similar to what was needed to realize the marketing idea that Mr. Ronald Thomas had before I first spoke with him.

6. That I received a telephone call from Mr. Thomas Hofbauer of Sony Corporation who indicated that Plaintiff Ronald Thomas had contacted Sony Corporation asking for information about video duplication equipment.

7. That Mr. Thomas Hofbauer of Sony Corporation called me and gave me Mr. Thomas' telephone number.

8. That Mr. Thomas indicated that Mr. Hofbauer had given him my telephone number as well because I had advised other Sony clients regarding issues of using high speed duplication equipment in order to produce large volumes of video cassette copies overnight.

9. That after flying down to Miami to meet with Mr. Thomas, Mr. Thomas presented his idea of creating a video version of the popular "Auto Trader" used vehicle publication. Mr. Thomas wanted to edit hundreds of video clips recorded on sellers' own camcorders to produce and organize master tapes that would be used for duplicating the video cassette copies which then would be distributed to retail stores the next morning.

10. That I Schwab explained to Mr. Thomas that such a method was impractical and that every step involved well known technology, and that further the cost structure would be untenable, and that it would not be cost effective to leave high speed duplication equipment unused for the other six days a week.

11. That I suggested to Mr. Thomas that the system should be based on still images that would be sourced either from scanned photographs or from digital still cameras, both which could be stored on a PC and sequenced automatically to create the master tape. This process would involve no longer than the real time to play the various segments. Thomas agreed with my proposal and told me to go ahead with designing and building the system.

12. That on September 30, 1993 I completed the first drawings of his system and faxed copies to Mr. Thomas.

13. That on November 17, 1993 I provided a status report with detailed information on how the system would work, and at the same time requested payment for computer equipment purchased for the system.

14. That with Mr. Thomas' approval I had retained MegaRam Computer Systems to write the computer software for the system, since I Schwab was not a computer software expert.

15. That with Mr. Thomas' approval I advanced payment toward the software work.

16. Despite the fact that I was to have received a 10% interest of Video Exchange Industries, Inc. ("VEI"), a company Mr. Thomas had himself created in the State of Florida, in consideration for my continued participation, I never received any ownership of that company, and furthermore, Mr. Thomas in his deposition acknowledged that he could not recall whether there was any ownership or stock ever given to me.

17. In order to compensate me for my ongoing participation, Mr. Thomas further agreed to continue to pay me, on a monthly basis, the same compensation he agreed to in the original consulting contract, which was $5,000 per month.

18. That I agreed to participate in the VEI venture for installation, training and technical support in exchange for a 10% interest in VEI only, however that agreement was never formalized nor, as previously indicated, did I receive any stock certificates representing ownership participation in VEI.

19. That on March 24, 1995 the patent application "Secured Digital Interactive System for Unique Product Identification and Sales" was filed and that this

was my concept and invention to use network computers to facilitate sales; and on May 30, 1995 the patent application "Secure Identification System" was filed, and that this was my concept and invention to use credentials residing in a central computer location for authenticating products and individuals at remote locations.

20. That all of these patent applications were created by me, alone, including all claims and Continuations-In-Part, without any contributions from, or the participation of, Mr. Ronald Thomas.

21. That on April 12, 1996, Mr. Thomas hired attorney Lucy Benham to create TS Holdings, Inc., on which Mr. Thomas was a member and of which I was a member, listing me as the Resident Agent solely because Mr. Thomas was not yet a resident of the State of Michigan, and with me to serve as the Resident Agent only until Mr. Thomas became a legal resident of the State of Michigan.

22. That on April 30, 1996 Mr. Thomas hired attorney Lucy Benham to create TeleScan Technlogies, LLC., in which Mr. Thomas was a member and of which I was supposed to be a member.

23. That I never did receive any operating agreement or any shares of stock in TeleScan Technologies, LLC.

24. As part of the deal with Chancellor Corporation to purchase a 50% interest in TruckScan LLC, a company created by TeleScan Technologies, LLC which was licensed to use my patents for marketing in the heavy truck and trailer market, TeleScan Technologies, LLC received a payment of $350,000, whereby I received a partial payment of monies owed to me on my outstanding bills at that time from Mr. Thomas.

25. That Mr. Thomas informed me that he would take care of all of the business aspects and that I was to confine my activities only to technical issues.

26. That in the fall of 1996 The Associates and Freightliner backed away from dealing with Mr. Thomas, but Mr. Thomas had refused to allow Chancellor to step into the negotiations because Mr. Thomas was determined to earn a sales commission himself for negotiating with these two potential clients.

27. That I had suggested to Mr. Thomas that he allow the attorneys to work on the details whereby Mr. Thomas rejected the advice and said that he would take care of the negotiations himself.

28. That in early 1997 the Associates discontinued discussions, and I and Gregory Harper traveled to Freightliner's main office in Portland, OR in an attempt to revive negotiations with them. At the same time the President of Freightliner Used Truck Division made it clear that as along as Mr. Thomas was involved that there would be no deal, because he was a difficult man to work with.

29. That despite these assurances that Gregory Harper would be in charge and I would continue to supply technical guidance, Freightliner declined to move forward and an existing client Navistar decided to build its own system and drop the TruckScan service.

30. That during the summer and fall of 1998 Mr. Thomas attempted to launch TrailerScan for semi trailers and Heavy Scan for heavy construction equipment, both products drafted by me.

31. That I received no interest in any of these companies, but rather was verbally assured and believed that I would continue to receive $5,000 a month.

32. That I hired a computer programmer to write the software program and advanced the money for this.

33. That over the next 12 years I continued to provide technical assistance and business contacts in an attempt to enable Mr. Thomas to secure other investment partners so that I might be able to recoup and receive money due and owing to me, as I was never paid for any of these activities.

34. That Mr. Thomas continued to ask me to provide demonstrations, discussions, and marketing materials for the various products.

35. That Mr. Thomas unbeknownst to me had executed an agreement with Mr. Frederick Fehlauer in which Mr. Thomas claimed that he had the rights to four patents, two of which Mr. Thomas had allowed to expire and enter the public domain due to his failure to pay the patent maintenance fees.

36. That on October 22, 2008 Mr. Thomas had patent attorney John Chupa's office send me an Assignment for the patent number. '784 and its open continuation application, with the Assignee being left blank.

37. Later on the same day, October 22, 2008 a second Assignment form arrived which also included patent 6,226,412 and again called for me to Assign the patent even though no Assignee entity was filled in.

38. That as a result I became suspicious and began investigating the status of the various TeleScan companies.

39. That I learned that the original TS Holdings, Inc., in which I was a member and stockholder had been subject to automatic dissolution almost ten years earlier.

40. That I also discovered that Mr. Thomas had created T.S. Holdings, LLC, which Mr. Thomas alone owned and in which I had no knowledge or interest in said company.

41. That the difference between the original automatic dissolution almost ten years earlier and in the T.S. Holdings, LLC. was slightly different spelling, and in the form LLC rather than a regular corporation.

42. That Mr. Thomas had also created in late 2008 contemporaneous with the issuance of patent no. 7,418,474B2 to me, a new entity called TS Holdings, Inc.; that I had no relationship with TS Holdings, Inc. II, nor had I received any operating agreement but rather received a stock certificate for 1,000 shares in TS Holdings, II that was unsolicited and for which I was issued certificate no. 003. This was sent to me in January 2009, only after Mr. Thomas became aware that I had discovered the series of companies with similar names that Mr. Thomas had created.

43. That as stated above these shares were unsolicited and not part of any agreement between me and Mr. Thomas.

44. That I also discovered another entity called I.D. Technology, Inc. which had been created by Mr. Thomas in approximately 2004 and for which said company was renamed I.D. Resources, Inc. shortly before 2005.

45. That this company, I.D. Resources, Inc. had been created with a full set of officers, including people entirely unknown to me. Mr. Thomas was the sole owner and Mr. Thomas' wife, Daccarrette Thomas was President, apparently to create the appearance that it was a minority run business.

46. That at the deposition of Daccarrette Thomas I learned that she had no idea of why she was listed a President nor did she have any involvement in operating this company.

47. That I learned that Mr. Thomas changed the name of I.D. Technology, Inc. to I.D. Resources, Inc., and changed the officers to show Antoine Joubart as President and Daccarrette Thomas as Secretary, Treasurer and Resident Agent.

48. That despite the fact that I did not enter into any shareholder agreement or any licensing agreement with Mr. Thomas' companies, TS Holdings, LLC, TS Holdings, Inc. II, ID Technology, Inc., or ID Resources, Inc. that Mr. Thomas continued to advertise, represent and make representations that I had been named Chief Technology Officer while admitting publicly on his web site that I was the inventor of the Proprietary Technology being used by ID Resources. Inc.

49. That at no time was I ever given any consideration for the use of my name or did I license any of my patents to Mr. Thomas to use in this company, of which I was not a member, officer, employee or shareholder thereof.

50. At no time did I ever have access to bank accounts or to financial resources of any of the companies previously indicated.

51. That it was my belief that it was the intent of Mr. Thomas to have me execute a blank Agreement assigning my patent right to a company that Mr. Thomas alone controlled, thereby effectively denying me any participation in the profits from my invention.

52. That at no time during the period of these events did I even hold a key to any company mailbox, and thus could only see mail that was provided to me by Mr. Thomas.

Further deponent saith not.

_____
BARRY SCHWAB

Subscribed and sworn to before me
this 14 day of March, 2011

_____
Notary Public, Oakland County, MI
My Commission Expires: 8-25-13

ERIN MARY SEELIG
Notary Public, State of Michigan
County of Oakland
My Commission Expires Aug. 25, 2013
Acting in the County of Oakland